

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-15-00015-CV

_____


IN THE INTEREST OF L.E.S., A CHILD



On Appeal from the 76th District Court
Titus County, Texas
Trial Court No. 37,180



Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Justice Moseley

# O P I N I O N

James and Julie appeal from the trial court's order terminating their parental rights to their daughter, L.E.S.[1]  Both parents contend the evidence is legally and factually insufficient to support the trial court's findings that they (1) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered the physical or emotional well-being of the child, (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the physical and emotional well-being of the child, and (3) failed to comply with the provisions of a court order that specifically established the actions necessary for the parents to obtain the return of the child who had been in the temporary managing conservatorship of the Texas Department of Family and Protective Services (the Department) not less than nine months as a result of the child's removal from the parents under Chapter 262 of the Texas Family Code for the abuse or neglect of the child.  *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E), (O) (West 2014).  We affirm the trial court's judgment because we find (1) that sufficient evidence supports at least one finding of a statutory ground for termination of James' and for Julie's parental rights to L.E.S. and (2) that the trial court did not err in admitting a jailhouse recording of a conversation between James and Julie.

---

[1]We refer to the child by her initials and to the parents by fictitious names to protect the privacy of the child.  *See* TEX. FAM. CODE ANN. § 109.002(d) (West 2014).

## I. Sufficient Evidence Supports at Least One Finding of a Statutory Ground of Termination for Both James and Julie

### A. Standard of Review

"The natural right existing between parents and their children is of constitutional dimensions." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Indeed, parents have a fundamental right to make decisions concerning "the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial." *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014). This Court is therefore required to "engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to support the termination of parental rights." *Id.* at 500. "'[I]nvoluntary termination statutes are strictly construed in favor of the parent.'" *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied) (quoting *Holick*, 685 S.W.2d at 20).

In order to terminate parental rights, the trial court must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination and that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001 (West 2014); *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012). "Clear and convincing evidence" is that "degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014); *see In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). This standard of proof necessarily affects our review of the evidence.

3

In our legal sufficiency review, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder reasonably could have formed a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.). We assume the trial court, acting as fact-finder, resolved disputed facts in favor of the finding, if a reasonable fact-finder could do so, and disregarded evidence that the fact-finder could have reasonably disbelieved or the credibility of which reasonably could be doubted. *J.P.B.*, 180 S.W.3d at 573.

In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing. *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam). We consider only that evidence the fact-finder reasonably could have found to be clear and convincing and determine "'whether the evidence is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the . . . allegations.'" *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)); *In re J.F.C.*, 96 S.W.3d 256, 264, 266 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *J.F.C.*, 96 S.W.3d at 266. "[I]n making this determination," we must undertake "'an exacting review of the entire record with a healthy regard for the constitutional interests at stake.'" *A.B.*, 437 S.W.3d at 503 (quoting *C.H.*, 89 S.W.3d at 26).

4

Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, "'the rights of natural parents are not absolute; protection of the child is paramount.'" *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.) (citing *C.H.*, 89 S.W.3d at 26).

## B.    The Evidence

James and Julie's relationship, which began when James was twenty-six and Julie was sixteen, was riddled with domestic abuse and illicit drug use.[2] James physically abused Julie for a period of over four years, almost the entire time the couple had been together. The Department became involved after an incident of abuse on June 20, 2013. That afternoon, as Julie was preparing to go to work, she and James got into an argument which ended when James punched Julie in the face and "whipped" her. This took place while L.E.S. was in the home. James then took Julie to work, with L.E.S. in the car. Julie refused to go with James when her shift ended at midnight. Instead, she went to the Mount Pleasant Police Department for help. Julie was concerned about L.E.S. because she knew James had smoked methamphetamine in the past, and she was afraid he was high on methamphetamine while L.E.S. was in his care. Julie informed

---

[2]James was convicted of injury to a child resulting from his relationship with Julie when she was still a minor.

5

Officer Scott Wadley that she had been assaulted by her husband and that L.E.S. was in James' care after he had been smoking methamphetamine.

L.E.S., who was crying when officers arrived at the home to check on her welfare, was physically removed from James, and James was handcuffed for officer safety. The home was littered with garbage, was unclean, and was infested with cockroaches. L.E.S. was returned to Julie, and the Department was contacted due to the unsafe condition of the home and James' presence in the home. Julie was taken to the safety[3] shelter in Mount Pleasant.

David Zavala, a Department investigator, met with Julie at the Saf-T shelter, where Julie told him that she suffered from severe abuse at the hands of James for the last three years and that James was on methamphetamine. Julie indicated that methamphetamine use was an issue that James had been dealing with "for some time now." At the conclusion of the meeting, Zavala informed Julie that she should remain in the shelter and that she should not return to James. Julie signed a safety plan to this effect, and she agreed that the plan was in her best interest as well as the best interest of L.E.S. Zavala advised Julie that he would contact her at the shelter the following week.

Zavala returned to the shelter to meet with Julie on June 25, at which time Julie was evidently abiding by the safety plan. Approximately two hours after this visit was concluded, however, Zavala was contacted by the shelter director, Janet Woods. Woods reported that Julie was attempting to leave to return to James. Woods believed that L.E.S. could be in harm's way if

---

[3]The name of this agency is variously spelled in the record and the parties' briefs as "Safety," "Saf-T," and "Safe-T." The actual name of the organization is SAFE-T, which stands for Shelter Agencies for Families in East Texas. SAFE-T AGENCY, http://www.safe-tagency.com/ (last visited Aug. 13, 2015).

6

Julie was with James. After receiving this report, Zavala returned to the shelter and was informed by Woods that Julie had broken the shelter rules by sneaking a cell phone into her room. Julie had been in contact with James by text for the past five days and admitted talking to James about leaving the shelter with L.E.S. Because of this rule violation, Julie was asked to leave the shelter. The Department filed a petition for emergency removal, and L.E.S. was placed in foster care. The Department received a police escort outside of town for the placement, as James' truck was spotted outside the Department's office.

After the placement, Zavala met with Julie and James, who were planning on staying together. Julie, James, and L.E.S. were each scheduled for drug tests. L.E.S., who was one year old at the time, tested positive for methamphetamine. James tested positive for methamphetamine and marihuana, and Julie tested positive for marihuana.

Julie and James were both given service plans with which the couple complied until September 2013, when James tested positive a second time for marihuana. At this point, James basically stopped attempting to comply and moved to Dallas in October 2013. In December 2013, the trial court ordered James to have no contact with Julie or with L.E.S.[4] In January 2014, the trial court ordered a monitored return of L.E.S. to Julie, who was pregnant with her second child. Julie's second child, S.S., was born in March 2014.[5]

---

[4]The order stated that James was to have no contact with Julie or L.E.S. Julie was aware of the "no contact" order. The January 7, 2014, permanency hearing order stated that "visitation between [L.E.S.] and [James] . . . is not in the child's best interest" and that "[Julie] . . . shall have no contact of any kind with [James]."

[5]Julie's and James' parental rights to S.S. were also terminated. Their appeal from that termination order is the subject of a separate opinion, issued of even date herewith, under cause number 06-15-00016-CV, styled *In the Interest of S.S., a Child*.

From the time of the monitored return until S.S. was born, Julie was doing all that was required of her under the plan, and it likewise appeared that she was complying with the no contact order. There was evidence, however, which tended to suggest that Julie was in contact with James during the period of the monitored return. In January 2014, James' bail bondsman was attempting to locate James. The bail bondsman, who believed James was with Julie, spoke to Julie in the courtroom after James missed his court appearance date.[6] The bail bondsman told Julie that she knew James was with Julie, and Julie did not deny that statement. Julie was living in Tyler at the time. Ultimately, James, who was ostensibly living in Dallas, was arrested in Tyler on April 18, 2014.

According to Julie, James showed up at her home on the evening of April 18, 2014, and asked her for a ride to the bus station so that he could return to Dallas. There is neither an explanation in the record for James' presence in Tyler nor is there any explanation for James' knowledge of Julie's whereabouts. Julie agreed to give James a ride to the bus station. Julie, L.E.S., and S.S. were seated in the back seat of Julie's car, and James drove. After being pulled over by police for a traffic violation, James was arrested on outstanding warrants. Julie could not explain why she agreed to give James a ride that evening, but stated that she had no contact with James during the time of the monitored return until that fateful evening.

After his arrest, James was taken to the Smith County Jail. In spite of the no contact order, Julie and the two children visited James at the jail on five different occasions. Julie admitted that

---

[6]Julie admits that she spoke to the bail bondsman "at [a] criminal docket." Julie did not explain why she attended a criminal docket call or whether she was there for James. Nothing in the record indicates that Julie had criminal charges pending against her.

she did not think she would "get caught" if she and the children visited James at the jail. At least one of Julie's visits with James at the jail was audio/video recorded and introduced into evidence at trial.[7] On the recording, Julie can be heard referring to a "stash" she was saving. She told James, "[T]hat stuff you had back I was saving for me." She then stated that "Johnny and them" were asking her for some, but that she told them, "[T]hat's just mine." At trial, Julie denied that the "stash" referred to any type of illegal drug. When asked what the stash was, Julie stated that she could not recall. Julie and James' discussion at the jail also included plans to have a family together when the termination case was concluded. Julie admitted that this was not in the children's best interests.

When Karen Craver, Julie's conservatorship worker, learned of the April 18 incident and Julie's subsequent contact with James at the Smith County Jail, L.E.S. and S.S. were removed and placed in the home of the children's paternal aunt. In August 2014, after the second removal of L.E.S., Julie again tested positive for marihuana use. Craver also testified that based on her review of the jailhouse recording, Julie said she had saved James' stash in a U-Haul. Julie was waiting for James to get out of jail so they could use drugs together.

### 1. Termination of James' Parental Rights Under Section 161.001(1)(E)

"'Only one predicate finding under Section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest.'" *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied) (quoting *A.V.*, 113 S.W.3d

---

[7]The propriety of the trial court's ruling to admit the audio/video recording into evidence will be addressed later in this opinion.

at 362); *In re K.W.*, 335 S.W.3d 767, 769 (Tex. App.—Texarkana 2011, no pet.)); *see In re N.R.*, 101 S.W.3d 771, 775 (Tex. App.—Texarkana 2003, no pet.). Because James does not challenge the trial court's finding that termination of his parental rights was in the best interest of L.E.S., we will affirm the trial court's judgment if the evidence is legally and factually sufficient to support termination on at least one statutory ground. The trial court found that James engaged in conduct or knowingly placed L.E.S. with persons who engaged in conduct that endangered the physical and emotional well-being of L.E.S. *See* TEX. FAM. CODE ANN. § 161.001(1)(E).

"'Endanger' . . . 'means to expose to loss or injury . . . .'" *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). It is not necessary that the conduct be directed at the child or that the child actually suffer injury. Under subsection (E), it is sufficient that the child's well-being is jeopardized or exposed to loss or injury. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *N.S.G.*, 235 S.W.3d at 367. Further, termination under subsection (E) must be based on more than a single act or omission. Instead, a "voluntary, deliberate, and conscious course of conduct by the parent is required." *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.) (citing *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.)); *see Boyd*, 727 S.W.2d at 533; *N.S.G.*, 235 S.W.3d at 366–67.

The trial court heard about James' protracted history of domestic violence toward Julie. L.E.S. was in the home on at least one occasion in which James struck Julie in the face and beat her. According to Julie, James' violence toward her was so bad that "a few times," Julie believed

she was going to die. James' abuse of Julie began when she was sixteen, and "it's always been there." Julie is now twenty-one years old. Julie reported the abuse on only two occasions because she was fearful that James would kill her. A fact-finder "can 'consider the history of abuse between the mother and the father for purposes of subsection[ ] . . . (E), even if the children are not always present.'" *In re Z.M.*, 456 S.W.3d 677, 686 (Tex. App.—Texarkana 2015, no pet.) (quoting *In re A.V.M.*, No. 13-12-00684-CV, 2013 WL 1932887, at *5 (Tex. App.—Corpus Christi May 9, 2013, pet. denied) (mem. op.)).

The fact-finder also heard about James' extensive criminal record and his drug abuse. In addition to his conviction for injury to a child resulting from his relationship with Julie when she was still a minor, James was convicted of burglary of a building in 2001, assault in 2011, and unlawful possession of a firearm by a felon and endangerment of a child—L.E.S.—in 2014. While we recognize that imprisonment, standing alone, is not conduct which endangers the physical or emotional well-being of the child, "intentional criminal activity which expose[s] the parent to incarceration is relevant evidence tending to establish a course of conduct endangering the emotional and physical well-being of the child." *In re A.W.T.*, 61 S.W.3d 87, 89 (Tex. App.—Amarillo 2001, no pet.) (per curiam) (citing *Allred v. Harris Cnty. Child Welfare Unit*, 615 S.W.2d 803, 806 (Tex. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.)).

James tested positive for methamphetamine in July 2013. At trial, Julie testified that methamphetamine use was an issue with which James had been dealing "for some time now." It is probable that James used methamphetamine while L.E.S. was in his care, as Julie told police officers that she believed this to be the case on the day following the reported abuse by James in

11

June 2013. Disturbingly, L.E.S. tested positive for methamphetamine in July 2013, less than one month from the time Julie reported that L.E.S. was with James at a time Julie believed he was high on methamphetamine. Craver testified that based on her training and experience, a one-year-old child's exposure to methamphetamine can cause mental, physical, and developmental problems. James also tested positive for marihuana use in July 2013 and September 2013.

"'[C]onduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. Drug use and its effect on a parent's life and h[er] ability to parent may establish an endangering course of conduct.'" *J.L.B.*, 349 S.W.3d at 848 (quoting *In re N.S.G.*, 235 S.W.3d 358, 367–68 (Tex. App.—Texarkana 2007, no pet.)); *see J.O.A.*, 283 S.W.3d at 345 n.4; *In re S.N.*, 272 S.W.3d 45, 52 (Tex. App.—Waco 2008, no pet.) ("Evidence of illegal drug use or alcohol abuse by a parent is often cited as conduct which will support an affirmative finding that the parent has engaged in a course of conduct which has the effect of endangering the child."). "Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under section 161.001(1)(E)." *Walker v. Tex. Dep't Family & Protective Servs.*, 312 S.W.3d 608, 617–18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (citing *Vasquez v. Tex. Dep't Protective & Regulatory Servs.*, 190 S.W.3d 189, 195–96 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) ("terminating parental rights despite there being no direct evidence of parent's continued drug use actually injuring child")).

Here, the record is replete with evidence of James' abuse of Julie, his repeated criminal behavior (including conduct that endangered a minor) and his abuse of illicit and dangerous drugs.

Based on the combined weight of this evidence, the trial court could have easily formed a firm conviction or belief that James engaged in a voluntary, deliberate, and conscious course of conduct which endangered L.E.S.'s physical or emotional well-being.[8]

### 2.     Termination of Julie's Parental Rights Under Section 161.001(1)(D)

Because Julie does not challenge the trial court's finding that termination of her parental rights was in the best interest of L.E.S., we will affirm the trial court's judgment if the evidence is legally and factually sufficient to support termination on at least one statutory ground. *See O.R.F.*, 417 S.W.3d at 37. The trial court found that Julie knowingly placed or knowingly allowed L.E.S. to remain in conditions or surroundings which endanger the physical or emotional well-being of L.E.S. *See* TEX. FAM. CODE ANN. § 161.001(1)(D). "Under this Section, we must examine the time before the [child]'s removal to determine whether the environment [of the home] posed a danger to the child's physical or emotional well-being." *In re L.C.*, 145 S.W.3d 790, 795 (Tex. App.—Texarkana 2004, no pet.).

"A child is endangered when the environment creates a potential for danger that the parent is aware of, but disregards." *In re N.B.*, No. 06-12-00007-CV, 2013 WL 1605457, at *9 (Tex. App.—Texarkana May 8, 2012, no pet.) (mem. op.). Subsection (D) permits termination of parental rights based on a single act or omission by the parent. *In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied). "'[A]busive or violent conduct by a parent or other resident of a child's home can produce an environment that endangers the physical or emotional

---

[8]Although the trial court terminated James' parental rights under sub-sections 161.001(1)(D) and (O) of the Texas Family Code as well, we need not address these grounds as the evidence is legally and factually sufficient to support termination under ground (E).

well-being of a child.'" *In re B.E.T.*, No. 06-14-00069-CV, 2015 WL 495303, at *5 (Tex. App.—Texarkana Feb. 5, 2015, no pet.) (mem. op.) (quoting *In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ denied)). "Similarly, 'a parent's failure to remove himself and his children from a violent relationship endangers the physical or emotional well-being of the children.'" *Id.* (quoting *In re I.G.*, 383 S.W.3d 763, 770 (Tex. App.—Amarillo 2012, no pet.)) (citing *D.O. v. Tex. Dep't of Human Servs.*, 851 S.W.2d 351, 354 (Tex. App.—Austin 1993, no writ), *disapproved on other grounds by J.F.C.*, 96 S.W.3d at 267 ("finding evidence of child's residence in unstable household where violence frequently occurred and where ex-felons engaged in ongoing criminal activity resided was sufficient to sustain termination based on finding parent allowed child to remain in surroundings that endangered physical or emotional well-being")). Moreover, illegal drug use by a parent likewise supports the conclusion that the children's surroundings endanger their physical or emotional well-being. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see N.B.*, 2012 WL 1605457, at *9.

The uncontroverted evidence at trial established that the abusive relationship between James and Julie was long-standing and pre-existed the birth of L.E.S. Julie described one violent encounter between herself and James in June 2013 in which James punched her in the face and whipped her. That L.E.S. was present in the home at the time of this encounter is undisputed. Although Julie contends that because she was an abused and battered wife she was afraid to leave James, she nevertheless allowed L.E.S. to remain in a home in which L.E.S. was exposed to James' violent and abusive behavior. Julie's apparent inability to remove L.E.S. from the violence James inflicted upon her endangered L.E.S.' physical and emotional well-being. Stenet Frost, a licensed

14

professional counselor, testified that children who are exposed to domestic violence are more likely to exhibit aggressive and antisocial behavior. Such children are likewise more prone to suffer from depression and to have problems in school. Moreover, girls who are exposed to domestic violence are more likely to someday find themselves in relationships in which they will be victims. There is no assurance that Julie will cease to expose L.E.S. to situations involving domestic violence.

It is also apparent that although Julie was aware that James was using methamphetamine "for some time," she left L.E.S. in his care. As discussed in the previous section of this opinion, James' use of illicit drugs was clearly dangerous to L.E.S.' physical and emotional well-being. The child tested positive for methamphetamine in July 2013. Likewise, Julie did not deny smoking marihuana with James in the couple's home.

Applying the standards set out above, we hold the evidence both legally and factually sufficient to support the trial court's finding that Julie knowingly placed or knowingly allowed L.E.S. to remain in conditions or surroundings which endangered her physical or emotional well-being. Julie points out, however, that she was successful in completing the services assigned to her by the Department and that she was able to secure L.E.S.' monitored return. She further points out that the only misstep she made thereafter was to transport James to the bus station so that he could return to Dallas. In evaluating termination under ground (D), however, we are to examine the time prior to L.E.S.' removal to determine whether the environment of the home posed a danger to her physical or emotional well-being. *See L.C.*, 145 S.W.3d at 795. We have concluded that due to James' illicit drug use and due to his propensity for violent, abusive behavior, the home

15

environment posed a danger to L.E.S.' physical and emotional well-being. Furthermore, Julie exhibited an inability to protect L.E.S. from this environment: (1) she clearly planned on reuniting with James after his release from jail; (2) she brought L.E.S. to the jail to visit James in violation of the court's direct order that neither she nor L.E.S. should have contact with James; (3) she took L.E.S. with her when James requested a ride to the bus station, also in violation of the court's no contact order; and (4) she made plans with James to use drugs with him upon his release from jail. We must affirm the trial court's order terminating Julie's parental rights to L.E.S. pursuant to Section 161.001(1)(D). *See* TEX. FAM. CODE ANN. § 161.001(1)(D).[9]

## II.    Admission of the Recorded Jailhouse Conversation Was Not Error

Both James and Julie complain of the trial court's admission of an audio/video recording of a conversation they had at the Smith County jail while James was incarcerated.[10] They contend the recording was erroneously admitted over their objections that its contents are subject to the

---

[9]Although the trial court terminated Julie's parental rights under grounds (E) and (O) as well, we need not address these grounds as the evidence is legally and factually sufficient to support termination under ground (D). We observe, though, that Julie's drug use during the pendency of the termination suit and her violation of the safety plan prepared by the Department and of the trial court's no contact order is conduct which endangered the child and which would thus support termination under ground (E). *See* TEX. FAM. CODE ANN. § 161.001(1)(E); *In re K.L.*, No. 12-13-00334-CV, 2014 WL 668202, at *3 (Tex. App.—Tyler Feb. 19, 2014, no pet.) (mem. op.) ("Illegal drug use by a parent after the parent has agreed not to use drugs as part of a service plan for reunification with the children is sufficient to prove voluntary, deliberate, and conscious endangerment by clear and convincing evidence."); *In re K.C.B.*, 280 S.W.3d 888, 895 (Tex. App.—Amarillo 2009, pet. denied) ("The trial court could view appellant's actions in violating the safety plan as conduct that endangered the child.").

[10]This recording took place as Julie spoke to James via a telephone provided by the jail for the purpose of visitor/inmate communication. Julie and James were able to view one another during the course of the conversation via monitor. There is no evidence in the record regarding the Smith County Jail's policy of recording visitor conversations with inmates. We, therefore, do not know if all conversations between inmates and visitors are routinely recorded.

spousal communications privilege.  *See* TEX. R. EVID. 504.[11]  The Department contends that the recording was properly admitted pursuant to Section 261.202 of the Texas Family Code.  *See* TEX. FAM. CODE ANN. § 261.202 (West 2014).  This statute provides, "In a proceeding regarding the abuse or neglect of a child, evidence may not be excluded on the ground of privileged communication except in the case of communications between an attorney and client."  TEX. FAM. CODE ANN. § 261.202.  Both parties, therefore, assume the communication is privileged.

While the content of the recording makes it apparent that James and Julie believed their communication was private, the conversation was, in fact, recorded.  Nothing in the record, however, indicates that either party to the conversation was aware that it was being recorded.  The Department failed to introduce any evidence that either party signed a statement that telephone calls might be monitored by the Smith County Jail, *cf. Capps v. State*, 244 S.W.3d 520, 529 (Tex. App.—Fort Worth 2007, pet. ref'd) (telephone conversation between inmate and spouse not privileged because inmate signed statement acknowledging telephone calls might be monitored),

---

[11]Rule 504 provides,

> **(a)** **Confidential Communication Privilege**.
> > **(1)** **Definition**.  A communication is "confidential" if a person makes it privately to the person's spouse and does not intend its disclosure to any other person.
> > **(2)** **General Rule**.  A person has a privilege to refuse to disclose and to prevent any other person from disclosing a confidential communication made to the person's spouse while they were married.  This privilege survives termination of the marriage.
> > **(3)** **Who May Claim**.  The privilege may be claimed by:
> > > **(A)** the communicating spouse;
> > > **(B)** the guardian of a communicating spouse who is incompetent; or
> > > **(C)** the personal representative of a communicating spouse who is deceased.
> > The other spouse may claim the privilege on the communicating spouse's behalf—and is presumed to have authority to do so.

TEX. R. EVID. 504.  There are several exceptions to the privilege, none of which are claimed to apply here.

or that either otherwise knew the conversation was recorded. The only people depicted in the recording, other than James and Julie, were the children and people who were "walking past." The recorded conversation took place in a large room with multiple monitors. There were, however, partitions between the seating areas where the telephones are located, ostensibly for the privacy of the speaker. Because the conversation between Julie and James was private and there is no evidence that either intended its disclosure to any other person, we will treat it as covered by the privilege. We must, therefore, determine if Section 261.202 of the Texas Family Code removes that privilege in this case.

At least one appellate court has concluded that Section 261.202 applies to civil cases involving the termination of parental rights. *In re W.B.W.*, No. 11-11-00269-CV, 2012 WL 2856067, at *15 (Tex. App.—Eastland July 12, 2012, pet. denied) (mem. op.). In *W.B.W.*, the jury was permitted to hear evidence that consisted of Father's communications with a clergyman. *Id*. On appeal, Father argued that the trial court erred in admitting this evidence, as it was subject to the communications-to-clergyman privilege set forth in Rule 505 of the Texas Rules of Evidence. *See* TEX. R. EVID. 505. The appellate court, in reliance on Section 261.202 of the Family Code, held that because the case before it was "a proceeding regarding the abuse or neglect of a child," Father was not entitled to invoke the clergy privilege. *W.B.W.*, 2012 WL 2856067, at *15. In so deciding, the court noted that "the legislature chose the broad term 'proceeding,' indicating the applicability of Section 261.202 to any proceeding, criminal or civil." *Id*.

"[T]he legislature chose the broad term 'proceeding' rather than the more specific term 'suit,' indicating the applicability of section 261.202 to *any* proceeding, criminal or civil."

18

*Almendarez v. State*, 153 S.W.3d 727, 728 (Tex. App.—Dallas 2005, no pet.). Clearly, the trial in the court below was a "proceeding" as envisioned by Section 261.202. Further, the termination proceeding involved the abuse or neglect of a child, L.E.S. Chapter 261 of the Texas Family Code, entitled "Investigation of Report of Child Abuse or Neglect," contains definitions of both terms. TEX. FAM. CODE ANN. § 261.001(1), (4) (West 2014). The definitions given there, however, are not exhaustive. *See* TEX. GOV'T CODE ANN. § 311.005(13) (West 2013) ("includes" is term "of enlargement and not of limitation or exclusive enumeration"); *see In re E.C.R.*, 402 S.W.3d 239, 246 (Tex. 2013) (the terms "abuse" and "neglect" utilized in section 261.001 "are defined broadly and nonexclusively"). Given these broad parameters, there can be no question that this was a proceeding involving the abuse or neglect of a child. Julie and James were therefore not entitled to invoke the spousal communication privilege, and the trial court did not err in admitting the audio/video recording. *See* TEX. FAM. CODE ANN. 261.202; *W.B.W.*, 2012 WL 2856067, at \*15.

## III.  Conclusion

We affirm the trial court's judgment.

Bailey C. Moseley
Justice

Date Submitted:    August 11, 2015
Date Decided:      August 18, 2015